Cabart Theatres Corporation, a California Corporation, v. Commissioner.
Cabart Theatres Corp. v. Commissioner
Docket No. 11434.
United States Tax Court
1948 Tax Ct. Memo LEXIS 144; 7 T.C.M. (CCH) 445; T.C.M. (RIA) 48127; June 30, 1948
C. C. Legerton, Esq., for the petitioner. B. N. Coon, Esq., for the respondent. DISNEY
Memorandum Findings of Fact and Opinion DISNEY, Judge: This proceeding involves a deficiency of $6,539.74 in income tax for 1942. The issues are whether the respondent erred (1) in disallowing a net loss carry-over from the year 1940 in the amount of $15,427.60, and (2) disallowing, as excessive, $1,500 of officer's salary. Findings of Fact The petitioner, a California corporation, organized on July 1, 1933, filed its return for 1942 with the collector for the sixth district of California on an accrual basis. Since its organization, petitioner has *145 been engaged in owning and operating moving picture theaters, holding stock in other corporations engaged in the moving picture theater business, and rendering administrative service in the operation of other theaters. The petitioner at all times has been a closed corporation. On August 17, 1939, it had 10,000 shares of stock outstanding, par value $10 each and owned in equal amounts by Milton B. Arthur, at all times president and operating executive of petitioner, Marie H. Arthur, Marco Wolff and Martha V. Caballero, wife of Charles A. Caballero. Friction existed between Charles A. Caballero and Milton B. Arthur from the time petitioner was organized and it ultimately resulted in a question of who should sever his connection with petitioner. Milton B. Arthur was willing to do almost anything to get rid of Charles A. Caballero and petitioner was anxious to eliminate the existing friction. On an undisclosed date the petitioner and Caballero entered into a written proposal, providing, among other things, for the acquisition by petitioner of the 2,500 shares of stock owned by Martha V. Caballero. It recited that Caballero owned 25 per centum of the stock of petitioner; that the latter *146 owned 49 per centum of the stock of three corporations in Orange County and that "Caballero shall exchange the 25% of Cabart stock owned by him for one-half of the 49% interest owned by Cabart." It also provided that "The foregoing proposal shall become effective as of July 24, 1939, but only upon the signing by the parties hereto of the written agreement intended to be entered into between them," and for the employment of Caballero by petitioner. On August 17, 1939, petitioner, Caballero and his wife entered into a written agreement, in which, among other things, petitioner agreed to transfer to Caballero one-half of its interest of 49 per centum of the outstanding stock in three corporations operating theaters in Orange County, California, and the other parties agreed to transfer to petitioner, free and clear of encumbrances, the 2,500 shares of stock of petitioner outstanding in the name of Martha V. Caballero, the transfer to be made concurrently with the delivery of stock to be made by petitioner. Caballero was to receive any dividends declared on and after July 24, 1939, on the stock to be delivered to him. Pending the delivery of the stock to him, Caballero agreed to deposit *147 the 2,500 shares of stock in escrow for delivery to petitioner in accordance with the terms of the agreement. Any dividends declared and paid on the 2,500 shares after the date of the agreement were to be paid to petitioner. The stock was not to be voted and was to be deemed treasury stock from the date of the agreement, provided, however, that if the stock was returned to Caballero pursuant to instructions set forth in an escrow letter of instructions, dated August 17, 1939, the stock was to be effective for all purposes as if the agreement had not been made. The stock petitioner owned of the three Orange County theaters was on deposit as collateral for a bank loan, which loan petitioner agreed to pay not later than January 15, 1940, in order to deliver one-half thereof to Caballero, free and clear of liens. Petitioner, as part of the consideration for the transfer of stock to it, agreed to pay to Caballero, when, as and if, received, onehalf of the administration fees provided for in an agreement with two corporations. Stock certificates for the 2,500 shares of stock of petitioner were endorsed in blank by Martha V. Caballero on August 17, 1939, with Internal Revenue stamps *148 affixed there-to, and deposited with an escrow agent, with instructions by petitioner and Caballero that upon payment of the bank loan by petitioner, to deliver one-half of the stock pledged as security to Caballero and the other one-half, together with 2,500 shares of stock of petitioner, to petitioner. Authority was given the escrow agent to have the stock of the Orange County theaters reissued for delivery of the appropriate number of shares to the parties and to affix revenue stamps thereto. The letter of instructions to the escrow agent also provided that if the note, evidencing the bank loan, was not paid on or before January 15, 1940, the 2,500 shares of stock of petitioner were to be delivered to Caballero upon his demand and the stock of the three Orange County theaters, on deposit as collateral, was to be delivered to petitioner upon payment of the note. Dissolution of petitioner was not discussed during the negotiations which resulted in the execution of the contract. After entering into the agreement on August 17, 1939, petitioner paid to Caballero one-half of the dividends it received on the stock of the three Orange County theaters and one-half of the administration *149 fees. The bank loan was paid on January 24, 1940, and petitioner thereafter received the 2,500 shares of its stock. The shares acquired were entered in petitioner's books of account as treasury stock, and have never been reissued. The stock was carried as treasury stock at the close of 1940. The entry recording the transaction set up in an account entitled "Income on Exchange of Capital Assets" the difference of $7,823.25 between the par value of the 2,500 shares and the book value of the stock delivered to Caballero. Such difference was reported as income by petitioner in its return for 1940. The certificates for the 2,500 shares were transferred by Martha V. Caballero in blank and at some undisclosed date the word "Cancelled" was written on the face of each certificate. The balance sheets reported in the income and declared value excess profits tax return of petitioner for 1942 show as an asset at the beginning and close of the year, treasury stock in the amount of $25,000 and capital stock of $100,000. In his determination of the deficiency the respondent held that petitioner realized gain of $18,122.50 in 1940 upon the sale or exchange of the stock of the three Orange *150 County theaters, the amount being the difference between $35,299.25, an amount determined to be the book value of the 2,500 shares, and a basis of $17,176.75 for the stock sold or exchanged. The respondent adjusted the net loss of petitioner in 1940 in accordance with such determination. Excepting the transaction involved herein and the original issue of stock, there have been no sales of petitioner's stock. During the years 1936 to 1940, inclusive, the dividends received by petitioner on stock of corporations which operated moving picture theaters, and gain or loss from the operation of theaters owned by it and partnerships of which it was a member, and on administration fees received for operating theaters for others, were as follows: Administra-
Operation of
tion
Year
Dividends
Theaters
Fees
1936
$114,962.81
$ 8,463.35 [1]
$3,075.09 [1]
1937
36,987.00
16,819.91 [1]
701.59 [1]
1938
25,235.00
4,087.75
1,000.01
1939
10,829.00
17,211.36 [1]
2,600.88 [1]
1940
9,677.50
35,998.94 [1]
1,749.82 [1]
The net earnings of petitioner and the dividends paid by it, per books, for the period from 1935 to 1940, inclusive, were *151 as follows: Year
Net Earnings
Dividends paid
1935
$ 9,862.47
$ 25,200.00
1936
138,466.76
138,260.00
1937
35,816.90
1938
31,201.20
1939
5,712.96
1940
(20,248.01)
3,750.00
During the period from 1933 to 1941, some motion picture producers were operating under a block-booking system which required a motion picture theater company to agree at the beginning of a contract year to buy all or none of the producer's offer of a specified number of pictures to be produced during the year, coupled with a right to cancel 10 per centum of the total pictures selected from the poorest of them. Petitioner's range of selection was limited to pictures of R.K.O., Columbia, Universal, and the second run of Warner Brothers, and as a result obtained inferior pictures. The combined output of these four companies was insufficient for the proper operation of petitioner's theaters. At times, petitioner had to close a theater on account of inability to obtain pictures. In , the plaintiff filed an action against various motion picture producers, Paramount Pictures, Inc., Lowe's, Incorporated, *152 Radio-Keith-Orpheum Corporation, Warner Bros. Pictures, Inc., and Twentieth Century-Fox Film Corporation, and their subsidiaries, being the major defendants, claiming violations of sections 1 and 2 of the Sherman Anti-Trust Act. On November 20, 1940, pursuant to a consent filed by the plaintiff and the major defendants and their subsidiaries, the court signed a decree enjoining the consenting defendants, among other things, from offering for license or licensing more than five features in a single group or licensing one group of features conditioned upon the licensing of another feature or group of features. After the entry of the decree, the quality of motion pictures improved and petitioner was able to select one picture at a time. The balance sheets of petitioner, per books, at the close of 1939 and 1940, were as follows: ASSETS
December 31, 1939
December 31, 1940
Cash
$ 495.00
$ 6,803.79
Receivables
13,275.29
4,719.05
Stocks owned
71,853.50
55,926.75
Theaters owned
114,120.86
94,240.74
Partnership Investment
4,419.26
12,487.82
Office Furniture
1,901.99
Due from Stockholders
5,000.00
Due from affiliated companies
7,048.81
26,996.90
Deferred Charges and Deposits
12,903.01
8,111.83
Total Assets
$231,017.72
$209,286.88
LIABILITIES
Bank overdraft
$ 15,780.00 $ Accounts Payable
13,074.92
49,697.78
Notes Payable
57,459.83
57,601.04
Contracts Payable
Accrued expenses
1,307.25
6,206.65
Deferred Liabilities
3,597.36
Capital Stock Outstanding
100,000.00
75,000.00
Earned Surplus
43,395.72
17,184.05
(before providing for Federal income taxes)
Total Liabilities
$231,017.72
$209,286.88
*153 The assets include $16,000 paid as part of the cost of a lease on the Lee Theater in Long Beach, California, and stock of the Gargano Theater Corporation, which hada lease on the Brayton Theater in Long Beach. The lease and stock were purchased in order to obtain better pictures for petitioner's Cabart Theater. Petitioner's theaters were operated at a loss from 1933 to 1940. The primary cause of the losses was inability to obtain pictures acceptable to the public. The petitioner acquired its moving picture theaters in Long Beach in 1930 because of information received that a large naval base would be constructed there and that it would become an industrial center. A contributing factor for the losses sustained in the operation of the theaters in Long Beach in 1939 and 1940 was loss of patronage caused by a reduction of Navy personnel in the city. The venture eventually became highly profitable. The petitioner and Caballero did not, during the negotiations resulting in the transfer involved herein, discuss the value at that time of the stock of petitioner. The petitioner's president, Milton B. Arthur, has been connected with the motion picture industry since 1926. In 1930 he *154 was offered $500 a week to operate the Roxy Theater in New York City. At some undisclosed time he was solicited to operate about forty theaters in St. Louis, Missouri, at a salary of between $500 and $600 a week. He did not desire to return to the East or go to the Midwest. His objective was to form a closed corporation. Arthur was paid an annual salary of less than $21,000 during the early years of the existence of petitioner. Lack of sufficient funds during one or two of the years prevented petitioner from paying him a larger salary. At times funds were not available to pay him any salary. In 1942 Arthur, as president of petitioner, managed five theaters each in Orange County, Los Angeles and Long Beach. In its income tax return for 1942, the petitioner reported gross income of $555,933.17, net income of $61,301.52, and claimed a deduction of $21,200 in schedule F and $21,025 on line 16 of the face of the return for compensation of officers and reported that all of such amount was for full time services rendered by its president. Petitioner paid no dividends in 1942. In its income tax return for 1942, petitioner reported a surplus of $14,502.98 at the close of 1941. In 1943, *155 lack of adequate transportation facilities required petitioner's president to discontinue the management of several theaters in Orange County and to employ a local manager. Petitioner reduced the salary of its president in that year by $25 a week on account of the employment of the local manager. In his determination of the deficiency the respondent allowed the amount of $19,700 as reasonable compensation for personal services rendered by Milton B. Arthur. The salary of $21,200 deducted by petitioner constituted reasonable compensation for personal services actually rendered by Milton B. Arthur. Opinion The point of difference between the parties on the first issue is whether taxable gain or deductible loss resulted from the stock transaction, and if so, the amount thereof, and whether it occurred in 1940 or 1939. The petitioner argues that the transaction was not a sale, as reported by it and determined by the respondent, but a distribution in partial liquidation. It also contends that if the transaction was a sale, it was completed in 1939, and that the value of its own capital stock was $6 a share. Sale or Partial Liquidation Section 115(i) of the Code reads as follows: *156 "(i) Definition of Partial Liquidation. - As used in this section the term 'amounts distributed in partial liquidation' means a distribution by a corporation in complete cancellation or redemption of a part of its stock, or one of a series of distributions in complete cancellation or redemption of all or a portion of its stock." The question at issue is factual. . The transaction was referred to as an "exchange" in the proposal entered into between petitioner and Caballero. In his testimony respecting the negotiations he conducted with Caballero for the transfer of stock, petitioer's president testified that Caballero or his wife surrendered the 2,500 shares "in exchange" for stock in the Orange County theaters. He also testified that "he [Caballero] offered to sell for twice as much as he wanted to buy for, and we made him a proposition that we would buy or sell at the same figure, and he wouldn't do that, he wanted the edge. * * *". No reference was made in the proposal or the agreement subsequently entered into on August 17, 1939, to the transaction as a partial liquidation. Additional evidence of a sale is shown by the agreement *157 that Caballero should receive as part of the consideration for the transfer, one-half of the administration fees received by petitioner in the future for operating certain theaters for other corporations. Thus petitioner gave up in the transaction, not only current assets, but incurred a liability to pay amounts out of anticipated income for a period not shown by the record. Furthermore, the proposal provided for the employment of Caballero, and it has not been shown that the understanding in that respect was not carried out. These provisions have no relation to partial liquidation proceedings. The petitioner did not record the transaction on its books as a partial liquidation. It treated it thereon and in its return for 1940, as one giving rise to taxable gain. The receipt of the stock in 1940 was recorded in petitioner's books of account as treasury stock and the stock was in such an account at the close of 1940, 1941 and 1942. Exhibit No. 13 of petitioner, purporting to be comparative balance sheets of petitioner at the close of the years 1935 to 1940, inclusive, shows capital stock outstanding of $100,000 at the close of 1939 and $75,000 at the close of 1940. Petitioner's return *158 for 1942 reported capital stock outstanding of $100,000 at the beginning and close of that year and as an asset treasury stock of $25,000. No explanation appears in the record for the reduction by $25,000 in 1940 of capital stock outstanding or the increase of that amount in the account in 1941. The absence of the treasury stock as such, in the asset side of the balance sheet for the close of 1940, in view of the fact that such an asset appeared in the books, indicates that the par value thereof was deducted in arriving at the figure $75,000 for capital stock. Petitioner makes no contention that the stock was retired. Opposed to such a finding is the fact that at all times important the stock was carried on the books as an asset in the form of treasury stock. Such fact is opposed to the idea that capital stock outstanding was in any wise altered by the transaction. Where, as here, the stock is not actually retired, the intent to retire the stock must exist at the time of acquisition of the shares in order to treat the amount received as a distribution in partial liquidation. . We are unable to find such intent here. Nothing of record is opposed *159 to the idea that the shares are still being carried on the corporate books as treasury stock and part of its capital stock outstanding. Upon brief petitioner refers to statutes of California concerning the acquisition by corporations of its own stock and subsequent disposition thereof for various purposes. Such statutes do not control the question before us. ; ; The petitioner admits the existence of a well established rule of the courts that a corporation may realize taxable gain upon the transfer of property for its own stock, but contends that such transactions involve the capital structure without affecting tax liability. The question has received much consideration by this Court and the Circuit Courts of Appeal. We find nothing in the argument of petitioner that has not been considered in the establishment of the principle and, accordingly, find no reason to depart from it in this proceeding and hold that the exchange was a taxable transaction. Year of Sale or Exchange. The petitioner contends that if the transfer *160 was a taxable transaction, it occurred for tax purposes in 1939 and not in 1940. In , the Court said: "There are no hard and fast rules of thumb that can be used in determining, for taxation purposes, when a sale was consummated, and no single factor is controlling; the transaction must be viewed as a whole and in the light of realism and practicality. * * *" The Court, in , said: "A closed transaction for tax purposes results from a contract of sale which is absolute and unconditional on the part of the seller to deliver to the buyer a deed upon payment of the consideration and by which the purchaser secures immediate possession and exercises all the rights of ownership. The delivery of a deed may be postponed and payment of part of the purchase price may be deferred by installment payments; but for taxing purposes it is enough if the vendor obtains under the contract the unqualified right to recover the consideration. [C.C.A. 3; ; *161 (C.C.A. 7)]." The agreement of August 17, 1939, did not by its terms transfer the stock; it was only an agreement to transfer upon the conditions set forth therein. The stock owned by petitioner was then pledged as security for a bank loan, a fact recited in the agreement, and accordingly, the securities were not in a deliverable state when the agreement to transfer was executed. Petitioner did not agree to pay the note at any time in order to release the collateral for transfer to Caballero. The agreement recited that delivery of the stock was to be made in accordance with the terms of an escrow agreement with a bank. The escrow agreement contained no promise of petitioner to pay the note on or before any specified date. It provided in that respect only that upon payment of the note, the escrow agent was to make the exchange and if the note was not paid on or before January 15, 1940, upon demand of Caballero, the 2,500 shares of petitioner's stock were to be delivered to him and upon payment of the note, the collateral was to be delivered to petitioner. Thus, petitioner was never unconditionally obligated to deliver the stock *162 prior to the payment of the bank loan and it could have defeated the arrangement, without liability to Caballero, by not paying the note. Until the payment of the note, Caballero had no unqualified right to the stock. Transfer of title was wholly contingent upon payment of the bank loan, a matter entirely within the discretion of petitioner. As we view the transaction, there was not to be an agreement of exchange before petitioner brought about a release of the stock it owned by payment of the note, and if the release did not occur on or before January 15, 1940, Caballero could cancel the transaction, without liability to either party, by simply serving a demand upon the escrow agent to return his wife's stock. The agreement entered into with respect to payment of dividends on the stock and administration fees, together with the affixing of transfer stamps, indicates intent to pass title with the execution of the contract. Opposed to such intent, aside from other provisions of the agreement, is the fact that petitioner did not enter the transaction in its books, or report it for taxation until 1940. The failure of petitioner to pay the note on January 15, 1940, placed Caballero in *163 a position to demand a return of his wife's stock without any formalities incident to transfer of title. He elected not to take advantage of his right and consented to make the exchange after the note was paid on January 24, 1940. The option thus given Caballero is opposed to the idea of intention to pass title prior to payment of the note on the date it matured. Cases cited by the petitioner are distinguishable. In , the intention of the parties was to pass title and to consummate the sale in 1926. Such proof, considering the entire record, is lacking here. In , aff'd., , the exchange was not subject to any contingencies and it was clear that the parties intended to pass title to the actual exchange of the stock. We find no error on the part of the respondent in treating the transaction as effective in 1940 for tax purposes. Amount of Gain. The petitioner reported gain on the transaction on the basis of a value of $25,000, or $10 a share, for its own stock, an amount equal to its par value. In his determination of the deficiency, the respondent *164 used the book value of $35,299.25 for the stock in computing gain on the transaction. Petitioner contends that the stock had a value of $6 a share. The respondent's finding of value is presumed to be correct. To support its position, petitioner relies primarily upon the opinion expressed by Milton B. Arthur, its president, at the hearing. His testimony on the value of the stock in 1939 and 1940 is merely that "We had some thought about the value of it, and it was around 60 cents on the dollar, about $6.00 a share." The grounds for arriving at the value were not revealed. The petitioner had net earnings each year from 1935 through 1939, the average yearly net income being about $44,000, or $4.40 a share. The dividends paid on the stock during that period were $163,460, all of which was paid in 1935 and 1936. Dividends of $3,750 were paid in 1940 in spite of an operating loss in that year of about $20,000. There were no other sales of petitioner's stock other than the original issue. Petitioner makes no contention that the assets of petitioner had a value less than book value, except that the account for theaters contained charges totaling $16,000 representing, petitioner asserts, *165 nuisance value paid for a lease and stock. We have only the bare testimony of petitioner's president that of the amount paid for the lease and stock, $16,000 was "nuisance value." Acquisition of the assets placed petitioner in a position to obtain a better grade of pictures for one of its theaters and without more evidence we are not in a position to find that the right had no value. The fact that petitioner has at all times carried the amounts on its books as an asset, instead of charging it off, indicates that it regarded the right as having value. Considering all of the evidence, we find that petitioner has failed to overcome the presumption in favor of the respondent's determination. Accordingly, we sustain the respondent on the first issue. Reasonableness of Salary The only controversy on the salary question is whether the amount of $21,000 paid was unreasonable to the extent of $1,500, as determined by the respondent. There is no proof of the salary paid by petitioner to its president in 1943 or prior to 1942, except that it was less than $21,000 per annum during a few years after 1933. However, the respondent, upon brief, admits, in effect, that a salary of $19,700, *166 the amount allowed as salary for the taxable year, was paid to Arthur in 1943, during which year the compensation of the officer was reduced by $25 a week, or $1,300, on account of the employment of a local manager to perform some of the duties performed by Arthur in prior years. Respondent contends that some part of the salary was paid in the guise of dividends. Arthur's stockholdings were only one-third of the stock outstanding. Of petitioner's earnings of about $200,000, from 1935 to 1940, inclusive, approximately $167,000 was paid out in dividends. Petitioner's earned surplus decreased in 1941, indicating, as in 1940, an operating loss. No dividends were paid in 1942. We find nothing in the record to support a holding that $1,500 of the total salary paid was paid under the guise of dividends. Considering the duties performed by Arthur, the volume of business of petitioner, the lack of salaries paid to other officers, if any, and other evidence of record, we conclude that the salary of $21,000 constituted reasonable compensation for services actually rendered and is deductible from gross income, as claimed by petitioner. Decision will be entered under Rule 50. Footnotes
1. Loss.↩